ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1031 (L), 23-1059

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────────────────────────

SIERRA CLUB,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

─────────────────

FREEPORT LNG DEVELOPMENT, L.P. and FLNG LIQUEFACTION 4, LLC,

*Intervenors for Respondent*.

─────────────────────────────────

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

─────────────────────────────────

## PETITIONER'S RULE 30(c) PROOF OPENING BRIEF

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
424-346-3276
tom.gosselin@sierraclub.org

*Attorneys for Sierra Club*
Dated June 30, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties

1.    Petitioner

Sierra Club

2.    Respondent

Federal Energy Regulatory Commission

3.    Respondent-Intervenors

Freeport LNG Development, L.P.

FLNG Liquefaction 4, LLC

### B.    Rulings Under Review

1.    Order Granting Extension of Time Request, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC*, 181 FERC ¶ 61,023 (Oct. 13, 2022).

2.    Order Addressing Arguments Raised on Rehearing, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC*, 182 FERC ¶ 61,112 (Feb. 23, 2023).

**C.    Statement of Related Cases**

Pursuant to Circuit Rule 28(a)(1)(C), the undersigned states that some of the issues raised in this case are similar to the issues raised in the following cases:

1.    *Sierra Club v. FERC*, D.C. Circuit Case No. 22-1235 (concerning Corpus Christi Stage III, FERC Dkts. CP18-512 and CP18-513).

2.    *Sierra Club v. FERC*, D.C. Circuit Case No. 22-1233 (concerning National Fuel Gas Supply, FERC Dkt. CP15-115).

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases...............................i

Table of Contents ...................................................................... iii

Table of Authorities..................................................................v

Glossary ..............................................................................viii

Jurisdictional Statement.............................................................1

Issues for Review......................................................................2

Statutes and Regulations.............................................................3

Statement of the Case ...............................................................3

    I.    Introduction ....................................................................3

    II.   Legal framework .............................................................4

    III. Factual Background ........................................................8

        A.   FERC's Initial Approval of the Project................................8

        B.   The First Extension ...................................................9

        C.   The Second Extension................................................11

Summary of Argument................................................................14

Standing ..............................................................................14

Argument..............................................................................17

    I.    Standard of Review ........................................................17

    II.   FERC's Finding of Good Cause To ExtenD The Completion
        Deadline Was Arbitrary...............................................17

        A.   FERC Did Not Even Attempt to Reconcile Its Finding That
            Freeport Had Made "Good Faith Efforts To Complete The
            Project" with Freeport's Unexplained Two-Year Delay In
            Seeking An Essential Replacement Contractor .................19

B.   COVID-19 Did Not Prevent Freeport from Meeting Its Completion Deadline, Because Freeport Would Have Missed The Deadline Even Without COVID-19 ..............................24

III.  Remedy ...................................................................................29

Conclusion ..........................................................................................30

Certificate of Compliance ......................................................................32

Certificate of Service ..............................................................................33

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ............................................................... 29

*Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.,*
   630 F.3d 217 (D.C. Cir. 2011) ............................................................... 28

*Del. Riverkeeper v. FERC,*
   753 F.3d 1304 (D.C. Cir. 2014) ............................................................. 17

*EarthReports, Inc. v. FERC,*
   828 F.3d 949 (D.C. Cir. 2016) ................................................................. 4

*Husky Ventures, Inc. v. B55 Investments, Ltd.,*
   911 F.3d 1000 (10th Cir. 2018) ............................................................. 28

*Mid-Tex Elec. Co-op, Inc. v. FERC,*
   773 F.2d 327 (D.C. Cir. 1985) ............................................................... 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................. 17

*Sierra Club v. FERC,*
   ___ F.4th ___, 2023 WL 3667435, *9 (D.C. Cir. 2023) (*"Mountain Valley"*) ....................................................................................................... 1

*Sierra Club v. U.S. Dep't of Energy,*
   867 F.3d 189 (D.C. Cir. 2017) ................................................................. 5

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   985 F.3d 1032 (D.C. Cir. 2021) ............................................................. 29

*WildEarth Guardians v. Jewell,*
   738 F.3d 298 (D.C. Cir. 2013) ............................................................... 16

**Statutes**

15 U.S.C. § 717b ........................................................................... 1, 4, 5

15 U.S.C. § 717o ................................................................................. 6

15 U.S.C. § 717r.................................................................................. 1

**Regulations**

18 C.F.R. § 385.2008............................................................................ 6

**FERC Orders**

*Arlington Storage Co., LLC,*
    155 FERC ¶ 61,165 (May 16, 2016).......................................21

*Chestnut Ridge Storage LLC,*
    139 FERC ¶ 61,149 (May 23, 2012)......................... 6, 7, 19, 29

*Columbia Gas Transmission, LLC,*
    172 FERC ¶ 61,162 (Aug. 25, 2020) .........................................5

*Const. Pipeline Co., LLC,*
    165 FERC ¶ 61,081 (Nov. 5, 2018) ...........................................7

*Const. Pipeline Co., LLC,*
    169 FERC ¶ 61,102 (Nov. 8, 2019) ....................................7, 19

*Corpus Christi Liquefaction Stage III, LLC,*
    169 FERC ¶ 61,135 (Nov. 22, 2019) .........................................5

*Corpus Christi Liquefaction Stage III, LLC,* Order Denying Rehearing,
    181 FERC ¶ 61,033 (Oct. 14, 2022) ..........................................6

*Corpus Christi Stage III, LLC,*
    179 FERC ¶ 61,087 (2022)............................................... 22, 23

*Delfin LNG, LLC,*
    181 FERC ¶ 61,144 (2022)........................................................6

*Freeport LNG Development, L.P.*,
   167 FERC ¶ 61,155 (May 17, 2019) ("Authorization Order") ............ 5, 9

*Mountain Valley Pipeline, LLC*,
   173 FERC ¶ 61,026 (Oct. 9, 2020) ................................................... 21, 26

*National Fuel Gas Supply Corporation*,
   179 FERC ¶ 61,226 (Jun. 29, 2022) ...................................................... 22

Order Addressing Arguments Raised on Rehearing, *Freeport LNG
   Development, L.P. and FLNG Liquefaction 4, LLC*,
   182 FERC ¶ 61,112 (Feb. 23, 2023) ................................................. i, 1, 13

Order Granting Extension of Time Request, *Freeport LNG Development,
   L.P. and FLNG Liquefaction 4, LLC*
   (Sept. 10, 2020) ("Extension Order I") .......................................... 11, 25

Order Granting Extension of Time Request, *Freeport LNG Development,
   L.P. and FLNG Liquefaction 4, LLC*,
   181 FERC ¶ 61,023 (Oct. 13, 2022)
   ("Extension Order II") .................. i, 1, 2, 5, 13, 17, 19, 20, 21, 22, 24, 27

*PennEast Pipeline Co., LLC*,
   170 FERC ¶ 61,138 (Feb. 20, 2020) ...................................................... 21

*Trunkline Gas Co., LLC*,
   179 FERC ¶ 61,086 (2022) .................................................................. 23

*Wyoming-California Pipeline Co.*,
   70 FERC ¶ 61,041 (Jan. 19, 1995) .......................................................... 6

# GLOSSARY

The following acronyms and abbreviations are used in this brief:

| | |
|---|---|
| Extension Application I | Freeport LNG, Request for Three Year Extension of Time to Construct Train 4 (July 27, 2020) |
| Extension Application II | Freeport LNG, Request for 26-Month Extension of Time to Construct Train 4 (May 16, 2022) |
| Extension Order I | Order Granting Extension of Time Request, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC* (Sept. 10, 2020) |
| Extension Order II | Order Granting Extension of Time Request, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC*, 181 FERC ¶ 61,023 (Oct. 13, 2022) |
| FERC | Federal Energy Regulatory Commission |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this petition pursuant to 15 U.S.C. § 717r(b), because the FERC order under review modifies an earlier FERC order issued pursuant to the Natural Gas Act, 15 U.S.C. § 717b(e). *See Sierra Club v. FERC*, ___ F.4th ___, 2023 WL 3667435, *9 (D.C. Cir. 2023) (exercising jurisdiction over a similar challenge to a FERC order extending the deadline for construction of gas infrastructure) ("*Mountain Valley*"). Sierra Club timely intervened in FERC's extension proceeding, Extension Order II, R09, P4 [JA___-___], and filed a timely request for rehearing.  Sierra Club filed a timely petition for review, and FERC issued an order addressing the merits of Sierra Club's rehearing arguments before FERC lodged the record with this Court and lost jurisdiction to further modify the record. 15 U.S.C. § 717r(b); *Freeport LNG Development, L.P.*, Order Addressing Arguments Raised On Rehearing, 182 FERC ¶ 61,112, P1 (Feb. 23, 2023), R14 [JA___] ("Rehearing Order").[1]

---

[1] After FERC issued this rehearing order, Sierra Club filed a second, protective petition for review, which was docketed as case 23-1059, which was consolidated with the lead case 23-1031. This Court subsequently explained that the second petition was unnecessary. *Mountain Valley*, 2023 WL at *9-10.

1

## ISSUES FOR REVIEW

Was FERC's finding of "good cause," 18 C.F.R. § 385.2008(a), to extend the deadline for completion of the Freeport Train 4 liquefied natural gas export project arbitrary, where:

1. FERC ignored Freeport's failure to follow its own previously proposed schedule for finding a contractor to actually build the project. Freeport's unexplained two-year delay to "initiate[]," Extension Application II, R04, at 3 [JA___], this process undermines FERC's conclusion that Freeport made "good faith efforts," Order Granting Extension Of Time Request, *Freeport LNG Development, L.P.*, 181 FERC ¶ 61,023, P12 (2022) ("Extension Order II") to meet the prior deadline.

2. FERC concluded that COVID-19 "prevented," *Id.* P12, Freeport from meeting the prior deadline, but FERC failed to explain how it did so, including failing to articulate a causal chain connecting COVID-19 to Freeport's failure to find a contractor, or to any other specific step.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## STATEMENT OF THE CASE

## I.  INTRODUCTION

This case challenges FERC's conclusion that there was "good cause" to extend, for a second time, the deadline for completing construction of the "Train 4" expansion of the Freeport liquefied natural gas ("LNG") export terminal. At the time FERC issued this extension—and as of the June 2023 date of this brief—Freeport had not yet started construction of this expansion, or even made the final decision to do so.

The reason Freeport needed to extend the May 17, 2026 deadline for completing construction of the project is that in 2020, Freeport lost its "engineering, procurement, and construction" contractor, but Freeport did not even solicit bids for a replacement contractor until 2022. This presented a problem for Freeport, because construction of the project will take approximately 56 months.

FERC's conclusion that there was "good cause" for this extension was arbitrary, where neither FERC nor Freeport provided any

3

justification for the fact that Freeport had gone nearly two years without even trying to find a contractor to build the expansion, wasting a prior extension. Because FERC failed to even try to reconcile this plain lack of effort with FERC's conclusion that Freeport had made good faith efforts to pursue the project, FERC's decision to grant the extension was arbitrary.

## II.  LEGAL FRAMEWORK

Natural gas exports are under the ambit of Section 3 of the Natural Gas Act, 15 U.S.C. § 717b.[2] Thereunder, FERC regulates "the siting, construction, expansion, or operation" of LNG export infrastructure and the Department of Energy ("DOE") approves the exports themselves. *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (citing 15 U.S.C. § 717b(a), (e)(1)). Under § 717b(a), DOE approves exports unless they would be inconsistent with the "public interest." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203

---

[2] A different section of the Natural Gas Act, section 7, concerns regulation of the construction and operation of jurisdictional natural gas pipelines. 15 U.S.C. § 717f. Section 7 is not directly at issue here because while the Train 4 expansion project does include a pipeline, it is not FERC-jurisdictional.

(D.C. Cir. 2017). The "public interest" includes, *inter alia*, consideration of "environmental" impacts. *Id.* at 202. FERC interprets § 717b(e)(1) to apply the same standard. *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, P18 (Nov. 22, 2019); *accord Freeport LNG Development, L.P.*, 167 FERC ¶ 61,155, P15 (May 17, 2019) (the "Authorization Order").

When FERC approves a project under Section 3, it imposes a condition setting a deadline by which the project must be completed and placed into service. Extension Order II, R09, P7 [JA___-___]. To set a deadline, FERC selects what it determines to be "a reasonable period of time" based on project-specific factors. Extension Order II, R09, P7 [JA___]. FERC sets such deadlines "because the information supporting [FERC's] public convenience and necessity determinations can go stale with the passage of time." *Columbia Gas Transmission, LLC*, 172 FERC ¶ 61,162, P12 (Aug. 25, 2020); *accord Corpus Christi Liquefaction Stage III, LLC*, 179 FERC ¶ 61,087, P15 (May 6, 2022). "If the service authorized by a certificate is not initiated within the time period specified in the certificate, it cannot be presumed that the public convenience and necessity still require the project." *Wyoming-California*

5

*Pipeline Co.*, 70 FERC ¶ 61,041, 61,130 (Jan. 19, 1995). Moreover, construction deadlines guard against "potential[] ... anti-competitive implications" that could result from allowing a developer to sit on an unused certificate indefinitely. *Chestnut Ridge Storage LLC*, 139 FERC ¶ 61,149, P9 (May 23, 2012).

The Natural Gas Act does not provide any specific procedure for extending a construction deadline. However, FERC exercises its general authority to "amend ... orders ... as it may find necessary or appropriate" to modify the deadlines specified in authorization orders. 15 U.S.C. § 717o; *Corpus Christi Liquefaction Stage III, LLC*, Order Denying Rehearing, 181 FERC ¶ 61,033, P11 (Oct. 14, 2022). In deciding whether to exercise that authority, FERC applies its general rule that provides that FERC "may" extend deadlines for "good cause." 18 C.F.R. § 385.2008(a). FERC expects project sponsors to apply for extensions in a manner "to avoid serialized extension requests." *Delfin LNG, LLC*, 181 FERC ¶ 61,144, P18 (2022).

"Good cause" for an extension requires an applicant to show that it "diligently pursu[ed] completion of the project" and made "good faith efforts to meet its deadline," but could not do so due to circumstances

6

beyond the applicant's control. *Const. Pipeline Co., LLC*, 169 FERC ¶ 61,102, PP21-22 (Nov. 8, 2019). For example, FERC has issued extensions where a permit was missing—because it either had not yet been issued despite the applicant's diligent efforts, or because it had been vacated by litigation—and this missing permit meant the applicant was legally prohibited from completing the project. *See, e.g.*, *Const. Pipeline Co., LLC*, 165 FERC ¶ 61,081, P9 and n.32 (Nov. 5, 2018) (collecting cases). Conversely, there is not good cause for an extension where an applicant "set its certificate on a shelf and let it lie dormant," rather than being "actively engaged in preparations in anticipation of commencing construction." *Chestnut Ridge Storage*, 139 FERC ¶ 61,149, P18.

When FERC denies a request to extend a construction deadline, FERC vacates the underlying certificate as moot, given that the applicant will be unable to meet the terms of the certificate. *Id.* P26. But this vacatur is "without prejudice" and if the applicant applies again, FERC can tier off the portions of the prior analysis that remain valid. *Id.*

## III.  FACTUAL BACKGROUND

### A.  FERC's Initial Approval of the Project

The Freeport Train 4 Project is a proposed expansion of the now-operating Freeport LNG export terminal.[3] The existing Freeport LNG export terminal—which is not directly at issue here—consists of 3 liquefaction "trains," each with the capacity to export 5.1 million metric tons annually. Environmental Assessment, at 8 [JA___].[4] The Train 4 Project would add an additional equivalent train, increasing the total capacity to 20.4 million tons per annum, and additional supporting facilities. *Id.*[5]

_____

[3] Freeport was out-of-service for an extended period of time after a catastrophic explosion occurred at the Freeport LNG export terminal on June 8, 2022. *See* Freeport Restart Likely Delayed to January, R10, at 1-3 [JA___-___].

[4] In compiling the administrative record here, FERC did not include any materials predating Freeport's first extension request, such as the Environmental Assessment or other materials related to FERC's initial approval of the Train 4 project. Certified Index to Record, No. 23-1031 (D.C. Cir. May 25, 2023), ECF No. 2000745. For the convenience of the Court, Sierra Club anticipates including materials in the FERC docket for this matter but not included in FERC's Certified Index to the Record in a separate Joint Appendix volume.

[5] The project would also include a new 10.6-mile-long 42-inch diameter pipeline. Environmental Assessment, at 13 [JA___]. However, this pipeline is not FERC-jurisdictional and is not directly implicated by the instant petitions.

The Train 4 Project would have serious environmental effects. The project's emissions of numerous pollutants would all have impacts on air quality exceeding the significance threshold used by FERC. Environmental Assessment, at 203 [JA___]. The project would also emit massive amounts of other air pollutants, *e.g.* volatile organic compounds. *Id.* at 198 [JA___]. If the Train 4 Project were placed into service, it would increase vessel traffic to the terminal by 75 ships per year. *Id.* at 133 [JA___].

FERC authorized the Freeport Train 4 Project on May 17, 2019. *Id.* at 1 [JA___]. FERC's authorization, like every similar authorization, set a deadline for completion of construction and placement of the Project into service: 48 months from the issuance of the authorization or May 17, 2023. Authorization Order, P86(B) [JA___]. Project construction was estimated to take 42 months. *Id.* P53 [JA___]. Thus, to satisfy this condition, Freeport would have had to begin construction within six months, approximately November 2019.

## B.  The First Extension

On July 9, 2019, Freeport wrote to FERC that it did "not plan to begin construction work on the Train 4 Project until the first quarter of

2020." Request for Approval Regarding Bi-Weekly and Monthly Status Reports, at 1 [JA___]. Freeport offered no further explanation. *See id.* But whatever the reason, Freeport knew at this time that it would not be able to satisfy its initial construction deadline.

Freeport eventually filed an application for an extension on July 27, 2020. Extension Application I, R01 [JA___-___]. Freeport claimed to need an extension for two reasons. First, "the … world-wide economic climate and depressed global LNG prices resulting from the coronavirus pandemic … make it challenging to complete long-term contracts with potential customers." *Id.* And, second, Freeport's engineering, procurement, construction, and commissioning ("EPC") contractor, KBR, Inc. ("KBR") exited the LNG business and Freeport had to "rebid" to select a new contractor. *Id.* at 2. Generally, applicants, like Freeport, do not construct, or perform other pre-operation activities on their own facilities. Instead, they hire independent contractors like KBR. As the name suggests, EPC contractors undertake "a wide variety of responsibilities, including the duties to provide for the design, engineering, procurement, and construction of the facility; to prepare start up procedures; to conduct performance tests; to create operating

manuals; and to train people to operate the facility." Contract Definition, *Black's Law Dictionary* (11th ed. 2011), *available at* Westlaw.

Freeport also claimed that construction would take longer than originally anticipated, 48-56 months. *Id.* at 1 n.3. However, Freeport did not explain why it had not yet started construction, or even site preparation activities.

On September 10, 2020, FERC granted the extension application with no analysis. *See* Order Granting Extension of Time Request, *Freeport LNG Development, L.P. and FLNG Liquefaction 4, LLC* (Sept. 10, 2020), R03 [JA___-___] ("Extension Order I"). The deadline became Freeport's requested May 17, 2026. *Id.* Thus, assuming a 56-month construction schedule, Freeport would have had to begin construction in September 2021.[6]

## C. The Second Extension

On May 16, 2022, Freeport requested a second extension, this time for 26 months. Extension Application II, R04, at 3 [JA___].

---

[6] Extension Order I is not directly at issue and is not being challenged by the instant petitions.

Freeport claimed it could not satisfy its deadline for the same two reasons as the first extension: (1) unspecified impacts from COVID-19; and (2) its lack of an EPC contractor. *Id.* at 1 [JA___].

Freeport also claimed to have "attempted in good faith to meet the in-service deadline" by: (1) obtaining and maintaining project permits; and (2) spending an unspecified percentage of the total project cost on developing the project. *Id.* at 2 [JA___]. But Freeport provided no details concerning these efforts. *See id.* And Freeport failed to begin its process to secure a replacement EPC contractor until May 2022. *See id.* at 3 [JA___]. Freeport had not yet begun construction and seemingly had not performed any site preparation activities in anticipation of construction. *See id.*

In response, Sierra Club filed a protest and motion to intervene. *See* Protest, R07 [JA___-___]. Sierra Club argued that Freeport's failure to take good faith steps toward project completion, *e.g.*, failing to even begin the process for finding a replacement contractor until May 2022, undermined its claim of good cause for an extension. *Id.* at 5 [JA___]. And Sierra Club also argued that COVID-19's impacts on the project

12

did not prevent Freeport from satisfying its deadline or failing to secure a replacement EPC contractor. *Id.* at 6 [JA___].

On October 13, 2022, FERC granted the second request for an extension. *See* Extension Order II, R09 [JA___-___]. Therein, FERC also granted Sierra Club's motion to intervene, *Id.* P4 [JA___], and concluded that Freeport demonstrated good cause for an extension. *Id.* P12 [JA___]. The new deadline is August 1, 2028. *Id.* P1 [JA___]. Assuming a 56-month construction timeline, Freeport would have to begin construction by approximately December 2023.

Sierra Club filed a timely request for rehearing. Rehearing Request, R10 [JA___-___]. FERC allowed that request to be denied by operation of law. Denial of Rehearing by Operation of Law, R12 [JA___-___]. FERC later issued an order addressing some of the arguments raised on rehearing. Rehearing Order, R14 [JA___-___]. FERC refused to address good cause in the rehearing order. *Id.* P7 [JA___]. Sierra Club timely filed these petitions for review.

13

## SUMMARY OF ARGUMENT

FERC's conclusion that Freeport demonstrated good cause for a 26-month extension is arbitrary. Part II. Freeport requested a 26-month extension to its deadline to complete construction of the Train 4 project. FERC granted the extension because it claimed that Freeport made a good faith effort to satisfy its deadline and demonstrated good cause for the extension. But FERC entirely failed to address Freeport's unexplained two-year failure to attempt to secure a replacement contractor to const the project after its initial contractor dropped out. Part II.A. And, further, FERC did not establish that Freeport's failure was the result of COVID-19 or that COVID-19 otherwise prevented Freeport from making progress on the Train 4 project. Part II.B.

Vacatur is the default remedy for arbitrary agency action and is the appropriate remedy here. Part III.

## STANDING

Sierra Club is a non-profit organization whose mission is germane to the Train 4 Project's impacts. Hinojosa Decl. ¶¶3-7. Sierra Club has members who live, work, and recreate in areas that will be affected by

14

the construction and operation of the Train 4 Project. These members would have standing to sue in their own right.

For example, Sierra Club has members who live approximately three miles from the proposed Train 4 facilities. Oldham Decl. ¶2; Harris Decl. ¶2; Environmental Assessment, at 3 [JA___] (explaining that the Train 4 project will be an expansion of the existing Freeport terminal and pre-treatment facility). Another member owns property in the project area and visits every other day. Jones Decl. ¶5. Emissions from construction and operation of Train 4 will increase ambient air pollution levels at these members' homes and in places they recreate. Oldham Decl. ¶¶6-11, 13; Harris Decl. ¶¶5-9; Jones Decl. ¶¶6-7; Environmental Assessment, at 47 (explaining that Angleton, Texas is 16 miles away from Freeport), 198 (explaining that modeled impacts to ambient air pollution are shown as far away as Angleton, Texas), 201 (table showing increase in ambient air concentration of several pollutants caused by Train 4) [JA___, ___, ___]. Train 4's impacts on ambient concentrations of nitrogen dioxide, particulate matter, and sulfur dioxide surpass the relevant Significant Impact Levels. Environmental Assessment, at 203 [JA___].

The Train 4 project will impact these members in other ways as well. Members will experience visual impacts because of, *inter alia*, Train 4's flaring, industrial lighting, and ship traffic. Oldham Decl. ¶¶7-8; Harris Decl. ¶¶5, 6, 10; Environmental Assessment, at 8-9 (the Train 4 expansion would "tie-in" to the existing Freeport LNG flare system); 103-04 (impacts from industrial lighting); 134 (Train 4 would increase LNG carrier traffic) [JA___-___, ___-___, ___]. Additionally, members' recreational pursuits would be adversely impacted. Oldham Decl. ¶¶7-11, 14; Harris Decl. ¶¶8-9; Jones Decl. ¶¶ 6-7.

These injuries are traceable to FERC's grant of an extension for construction of Train 4, and would be redressed by a favorable decision here. In this procedural injury case, for standing purposes, the Court must assume that if FERC had properly considered whether Freeport had good cause for an extension, it would have led FERC to deny the extension. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013). Without an extension from FERC, the Train 4 project cannot be built, and Sierra Club's members' injuries would not occur.

16

## ARGUMENT

## I.  STANDARD OF REVIEW

FERC's decision "will be set aside as arbitrary and capricious if it is not the product of reasoned decisionmaking." *Del. Riverkeeper v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). The Court must determine whether the agency has "examine[d] the relevant data" and made "a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The Court must ensure that FERC did not "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs counter to the evidence before" it. *Id.*

## II.  FERC'S FINDING OF GOOD CAUSE TO EXTEND THE COMPLETION DEADLINE WAS ARBITRARY

Here, and in prior orders, FERC stated that "good cause can be shown by a project sponsor demonstrating that [1] it made good faith efforts to meet its deadline but [2] encountered circumstances that prevented it from doing so." Extension Order II, R09, P7 [JA___-___]. FERC's conclusion that both of these elements were satisfied here was

arbitrary. On the first element, FERC ignored an entirely unexplained two-year delay between the time Freeport's EPC contractor announced it was exiting. Thus, FERC's finding that Freeport made a good faith effort to satisfy its deadline is contrary to the facts in the record and FERC's reasoning ignored an important aspect of the problem. On the second element, even if FERC had properly found that Freeport made a good faith effort to satisfy its deadline, neither FERC nor Freeport have established that Freeport encountered circumstances preventing it from doing so. Both cite COVID-19 as such a circumstance. But there is no reason to think that COVID-19 impacted Freeport's ability to secure a replacement contractor. And while FERC claims that COVID-19 disrupted Freeport's ability to secure long-term commitments for its LNG, the record, and FERC, are silent on how, exactly, COVID-19 impacted the project. Because FERC's decision to grant the extension is arbitrary, the Court should vacate the order below.

**A. FERC Did Not Even Attempt to Reconcile Its Finding That Freeport Had Made "Good Faith Efforts To Complete The Project" with Freeport's Unexplained Two-Year Delay In Seeking An Essential Replacement Contractor**

An unforeseen circumstance is not a blank check that relieves a developer of any obligation to pursue the project: FERC will only find good cause for an extension where the applicant has made a good faith effort to complete the project. Extension Order II, R09, P11 [JA___-___]. Such good faith efforts exist where the applicant "diligently pursu[ed] completion of the project," *Const. Pipeline Co., LLC*, 169 FERC ¶ 61,102, PP21-22, or "actively engaged in preparations in anticipation of commencing construction." *Chestnut Ridge Storage, LLC*, 139 FERC ¶ 61,149, P18.

Here, there is an entirely-unexplained two-year delay between the time when Freeport's first contractor announced it was exiting the LNG business, in June 2020, and the time when Freeport "initiated" the process of soliciting bids for a replacement, in May 2022. Extension Application II, R04, at 3 [JA___]. Freeport does not even assert that it could not have started this bidding earlier. To the contrary, Freeport's prior, July 2020 extension request indicated that despite the loss of the original contractor, and despite the pandemic, Freeport would be able to

19

secure a new contractor promptly, and be ready to begin construction by
September 2021. Extension Application 1 at 1 n.3, 2 [JA___-___]
(anticipating a 48 to 56-month construction period and completion by
May 2026).

Nevertheless, Freeport's 2022 extension application simply offers
no explanation whatsoever as to why selection of a replacement
contractor did not proceed on the schedule Freeport set out in 2020.
Freeport does not identify any steps it took to secure a contractor
between June 2020 and May 2022. Freeport does not argue that it was
prevented from acting earlier, or explain how it was so prevented.

FERC arbitrarily ignored this prolonged and unexplained period
of inactivity. FERC concluded that as of Freeport's 2022 extension
request, Freeport was "actively pursuing a new engineering,
procurement, and construction contractor." Extension Order II, R09,
P12 [JA___-___]. But FERC entirely ignored Freeport's failure to do so
for the preceding two years. Because the project cannot move forward
without a contractor who will actually build it, Freeport's failure to
"diligently" or "actively" pursue such a contractor during that two-year
period undermines Freeport's claim to have made good faith effort to

20

move the project forward. FERC's finding of good faith was contrary to the facts before it, or at a minimum, by ignoring this inactivity (rather than acknowledging it and explaining whether or how it was justified), FERC ignored an important part of the problem.

Other actions Freeport took unrelated to securing a replacement contractor cannot salvage FERC's good faith finding. Extension Order II P12 [JA___] ("Freeport LNG has … maintained its permits for the project [and] actively pursued commercial agreements."). Previously, where FERC has found good faith pursuit of a project, and good cause for an extension, FERC explained that the developer had "actively worked to restore *all* permits necessary for construction," *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,026, PP13-14 (Oct. 9, 2020) (emphasis added), or worked to obtain "*all* necessary approvals," *PennEast Pipeline Co., LLC*, 170 FERC ¶ 61,138, P13 (Feb. 20, 2020) (emphasis added); *accord Const. Pipeline Co., LLC*, 165 FERC ¶ 61,081, P25 (Nov. 5, 2018), or the developer was diligently working to resolve the *only* remaining barrier to construction. *Arlington Storage Co., LLC*, 155 FERC ¶ 61,165, PP11, 13 (May 16, 2016).

Meanwhile, FERC does not cite any prior FERC order or other authority holding that where a developer has unexplainedly failed to pursue steps that are absolutely essential to project completion, the fact that the developer has nonetheless expressed interest in other ways suffices to show diligent or active pursuit of the project.[7] Instead, in the prior FERC extension decisions cited by FERC, there was no additional barrier to the completion aside from the difficulties imposed by COVID-19. Extension Order II, R09, P11 [JA___-___] (collecting prior FERC decisions).

And the developers in those prior orders had generally made more significant progress in pursuing their respective projects than Freeport has made here. In *Corpus Christi Stage III, LLC*, 179 FERC ¶ 61,087 (2022),[8] FERC noted that, unlike here, the project sponsor there had entered into "recent[]" and prior contracts, indicating that

---

[7] What appears to be the only other FERC order extending a project completion deadline in similar circumstances, *National Fuel Gas Supply Corporation*, 179 FERC ¶ 61,226 (Jun. 29, 2022), is also currently on appeal to this Court. Petition for Review, No. 22-1233 (D.C. Cir. Sep. 6, 2022), ECF 1962600.

[8] This FERC order is also currently on appeal to this Court. *See* Petition for Review, No. 22-1235 (D.C. Cir. Sep. 6, 2022), ECF No. 1962539.

22

"commercialization of the project is close to completion." *Corpus Christi Stage III, LLC*, 179 FERC ¶ 61,087, P3. And in *Trunkline Gas Co., LLC*, 179 FERC ¶ 61,086 (2022), FERC cited the project sponsor's "completing front-end engineering design with engineering, procurement, and contracting companies." *Trunkline Gas Co., LLC*, 179 FERC ¶ 61,086, P21. Here, again, Freeport has not even tried to secure an EPC contractor.

FERC's failure to scrutinize Freeport's unsupported claim that it was making a good faith effort to complete its project has had consequences. Post-application, Freeport has still seemingly made almost no progress on the Train 4 project. Freeport provided two answers after it filed its extension application. *See* Answer in Opposition to Motion to Intervene and Protest of Sierra Club, R08 [JA___-___]; Motion for Leave to Answer and Answer in Opposition of Freeport LNG Development, L.P. et al. to the November 14, 2022 Request for Rehearing of Sierra Club, R11 [JA___-___]. The latter answer was filed on November 29, 2022. Despite the opportunity, in neither of these answers did Freeport demonstrate that it has made progress on the Train 4 project. Freeport did not claim that it secured a

23

replacement EPC contractor or provide an update on its efforts to secure an EPC contractor. Freeport also did not claim that it was closer to commercializing the project or had reached any agreements for its LNG. Thus, Freeport has seemingly continued to not diligently pursue the project.

Ultimately, Freeport's failure to even attempt to secure a replacement contractor until May 2022 and FERC's failure to even address Freeport's inaction renders FERC's good cause determination arbitrary.

## B. COVID-19 Did Not Prevent Freeport from Meeting Its Completion Deadline, Because Freeport Would Have Missed The Deadline Even Without COVID-19

Insofar as the two elements of FERC's good cause formulation are analytically distinct, even if FERC properly found that Freeport made a good faith effort to satisfy its deadline, good cause still hasn't been established because neither FERC nor Freeport established that COVID-19 prevented Freeport from satisfying its deadline. FERC's finding that Freeport was prevented from meeting the deadline rests on FERC's assertion that COVID-19 "caused major disruptions due to global lock-downs and logistical hurdles." Extension Order II P12

24

[JA___]. Although the pandemic disrupted many aspects of the global economy, it did not "prevent" Freeport from meeting its deadline, because without a contractor to build the project, Freeport would not have met the deadline even if there had been no pandemic. Neither FERC nor Freeport offer any argument or evidence indicating that the pandemic prevented Freeport from taking earlier steps to find a replacement contractor. And looking beyond the issue of securing a contractor, FERC did not identify a causal chain linking COVID-19 to any other specific barrier facing Freeport either.

Without a contractor, Freeport wouldn't have satisfied the deadline even without a pandemic. To meet the prior deadline, Freeport would have had to begin construction in approximately September 2021. Extension Order I, R03, at 2 [JA___]. And to begin construction, Freeport needed to secure a replacement EPC contractor. Extension Application I, R01, at 2 [JA___]. Given that Freeport had failed to secure a contractor by that implicit deadline for starting construction, it is clear that Freeport would have failed to meet its deadline even if the COVID-19 pandemic had not occurred. An unforeseen event only provides good cause for an extension where that event "thwarted" a

developer who otherwise would have met the deadline. *Mountain Valley Pipeline*, 173 FERC ¶ 61,026, P11 (Oct. 9, 2020). Because Freeport would not have met the completion deadline anyway, COVID-19 did not prevent Freeport from doing so here.

Nor does COVID-19 explain or excuse Freeport's failure to acquire or pursue a replacement contractor. Neither Freeport nor FERC explained why Freeport failed to rebid the EPC contract on a timeframe that Freeport indicated would have allowed construction to begin in September 2021, and thus allowed Freeport to meet the prior completion deadline. But there is no reason to believe that COVID-19 prevented Freeport from doing so. The only specific impact of COVID-19 on the project that Freeport identifies is that the pandemic's impact on global energy markets made it difficult to secure customers for the project. Extension Application II, R04, at 1 [JA___]. Developers do not need, or even ordinarily acquire, such customers before securing a contractor. This is demonstrated by Freeport's own conduct: Freeport announced an agreement with KBR in May 2020, well before Freeport had secured contracts for the expansion's output. Extension Application I, R02, at 2 [JA___]. More broadly, as summarized in Sierra Club's

26

rehearing request, several other LNG facilities signed contracts with EPC contractors in 2021 and early 2022, demonstrating that the pandemic did not make it categorically impossible to seek, negotiate, and secure such a contract, or at least make progress in doing so. Rehearing Request, R10, at 7 n.9 [JA___]. FERC offered no facts to distinguish Freeport from these other facilities.

Separate from the contractor issue, FERC's broader assertion that COVID-19 prevented Freeport from meeting its deadline is unsupported. *Cf.* Extension Order II, R09, P9 [JA___-___]; Extension Application II, R04, at 1 [JA___]. The only possible relevant record evidence about COVID-19's impact on Freeport's efforts to meet its deadline is Freeport's statement that COVID-19 "made it extremely difficult to secure long-term LNG commercial commitments." *Id.* But the relevance of these non-existent commitments is unclear from the record and FERC's order because FERC failed to explain both the impact to the project of not having the commitments and how it was interpreting the prevention standard. Did Freeport's failure to secure commitments for its LNG make progress on the project impossible, unwise, or merely less attractive? FERC never explains and FERC

27

cannot be this vague. *Mid-Tex Elec. Co-op, Inc. v. FERC*, 773 F.2d 327, 359 (D.C. Cir. 1985) (FERC acted arbitrarily in allocating costs based on "responsibility" without "offer[ing] even a hint as to what kind of 'responsibility' was decisive."). And, moreover, FERC failed to identify the links in a causal chain connecting the exigencies to elements of good cause. FERC failed to explain *how* the pandemic might have justified Freeport's failure to make progress on Train 4, or to identify facts demonstrating that prevention occurred here.

Good cause is a flexible standard that applies across a variety of contexts; but it is not flexible enough to accommodate Freeport's patent inaction here. This Court previously explained, in denying a request to modify a scheduling order under Fed. R. Civ. P. 16(b)(4), that where a party's "actions … do not bespeak diligence or any sense of urgency at all," good cause for an extension is not present. *Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 226 (D.C. Cir. 2011). Thus, good cause is not present when a party only takes a given action after it is too late to satisfy its deadline. *Id.*; *accord Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1019-22 (10th Cir. 2018).

28

Such is the case here. Freeport plainly "set its certificate on a shelf and let it lie dormant," rather than being "actively engaged in preparations in anticipation of commencing construction." *Chestnut Ridge Storage*, 139 FERC ¶ 61,149, P18. FERC's decision to find good cause and to grant the requested extension anyways without even attempting to address Freeport's unexplained refusal to take an essential step to satisfy its deadline is arbitrary.

## III. **REMEDY**

"The ordinary practice … is to vacate unlawful agency action." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citation omitted). There is no reason to depart from that ordinary practice here.

FERC is unlikely to be able to substantiate its decision on remand. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). FERC's decision is entirely unsupported by the record. And on remand, FERC will be unable to conclude that Freeport demonstrated good cause for an extension. Freeport cannot go back in time and make a good faith effort to satisfy its construction deadline. And without such a good faith effort, under FERC's

29

precedents, Freeport cannot demonstrate, and FERC cannot find, good cause.

Additionally, vacatur will not be disruptive. *See id.* Freeport is not close to constructing the Train 4 Project. Freeport has not entered into any contracts for its LNG despite initially applying for FERC authorization in 2017. Freeport, seemingly, *still* has not even secured a replacement EPC contractor. Given Freeport's lack of progress since the application and orders at issue here, it is likely, if not certain, that if this zombie approval is allowed to continue apace, Freeport will be applying for a third extension. That application would be burdened with the same fundamental problems at issue here and, perhaps, even more.

## CONCLUSION

For the reasons stated above, Sierra Club respectfully requests that the Court grant the petition and vacate FERC's Extension Order.


Dated: June 30, 2023

Respectfully submitted,

*/s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
424-346-3276
tom.gosselin@sierraclub.org

Nathan Matthews
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5695
nathan.matthews@sierraclub.org

*Attorneys for Sierra Club*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that the foregoing brief complies with:

1. the type-volume limitations of Rule 32(a)(7) because it contains 5,569 words, excluding the parts of the brief exempted by Rule 32(f); and

2. the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

*/s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
424-346-3276
tom.gosselin@sierraclub.org

*Attorney for Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June, 2023, I have served the foregoing Opening Brief for Petitioner Sierra Club, including the Addendum thereto, on all registered counsel through the Court's electronic filing system (ECF).

*/s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
424-346-3276
tom.gosselin@sierraclub.org

*Attorney for Sierra Club*

ORAL ARGUMENT NOT YET SCHEDULED

No. 23-1031 (L), 23-1059

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――――――――

SIERRA CLUB,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

―――――――――――

FREEPORT LNG DEVELOPMENT, L.P. and FLNG LIQUEFACTION
4, LLC,

*Intervenors for Respondent.*

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## PETITIONER'S STATUTORY AND REGULATORY ADDENDUM

Nathan Matthews               Thomas Gosselin
Sierra Club                   Sierra Club
2101 Webster St., Suite 1300  P.O. Box 4998
Oakland, CA 94612             Austin, TX 78765
415-977-5695                  424-346-3276
nathan.matthews@sierraclub.org   tom.gosselin@sierraclub.org

*Attorneys for Sierra Club*
Dated June 30, 2023

# ADDENDUM TABLE OF CONTENTS

**Statutes:**

15 U.S.C. § 717b.............................................................................1

15 U.S.C. § 717o.............................................................................5

15 U.S.C. § 717r.............................................................................6


**Regulations:**

18 C.F.R. § 385.2008.....................................................................9


**Standing:**

Declaration of Rebekah Hinojosa..................................................10

Declaration of Melanie Oldham......................................................13

Declaration of Pam Harris..............................................................25

Declaration of Gwendolyn Jones....................................................32


**Certificates:**

Certificate of Service .....................................................................38

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717b

§ 717b. Exportation or importation of natural gas; LNG terminals

Effective: August 8, 2005
Currentness

**(a) Mandatory authorization order**

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

**(b) Free trade agreements**

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

   **(1)** the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

   **(2)** the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

**(c) Expedited application and approval process**

For purposes of subsection (a), the importation of the natural gas referred to in subsection (b), or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

**(d) Construction with other laws**

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

**(1)** the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

**(2)** the Clean Air Act (42 U.S.C. 7401 et seq.); or

**(3)** the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

**(e) LNG terminals**

**(1)** The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

**(2)** Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

**(A)** set the matter for hearing;

**(B)** give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

**(C)** decide the matter in accordance with this subsection; and

**(D)** issue or deny the appropriate order accordingly.

**(3)(A)** Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

**(B)** Before January 1, 2015, the Commission shall not--

**(i)** deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

**(ii)** condition an order on--

**(I)** a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

**(II)** any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

**(III)** a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

**(C)** Subparagraph (B) shall cease to have effect on January 1, 2030.

**(4)** An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

**(f) Military installations**

**(1)** In this subsection, the term "military installation"--

**(A)** means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

**(B)** does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

**(2)** The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

**(3)** The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

### CREDIT(S)

(June 21, 1938, c. 556, § 3, 52 Stat. 822; Pub.L. 102-486, Title II, § 201, Oct. 24, 1992, 106 Stat. 2866; Pub.L. 109-58, Title III, § 311(c), Aug. 8, 2005, 119 Stat. 685.)

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 10485

<Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957.>

**Performance of Functions Respecting Electric Power and Natural Gas Facilities Located on United States Borders**

**Section 1. (a)** The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

**(1)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the transmission of electric energy between the United States and a foreign country.

**(2)** To receive all applications for permits for the construction, operation, maintenance, or connection, at the borders of the United States, of facilities for the exportation or importation of natural gas to or from a foreign country.

**(3)** Upon finding the issuance of the permit to be consistent with the public interest, and, after obtaining the favorable recommendations of the Secretary of State and the Secretary of Defense thereon, to issue to the applicant, as appropriate, a permit for such construction, operation, maintenance, or connection. The Secretary of Energy shall have the power to attach to the issuance of the permit and to the exercise of the rights granted thereunder such conditions as the public interest may in its judgment require.

**(b)** In any case wherein the Secretary of Energy, the Secretary of State, and the Secretary of Defense cannot agree as to whether or not a permit should be issued, the Secretary of Energy shall submit to the President for approval or disapproval the application for a permit with the respective views of the Secretary of Energy, the Secretary of State and the Secretary of Defense.

**Sec. 2.** [Deleted].

**Sec. 3.** The Secretary of Energy is authorized to issue such rules and regulations, and to prescribe such procedures, as it may from time to time deem necessary or desirable for the exercise of the authority delegated to it by this order.

**Sec. 4.** All Presidential Permits heretofore issued pursuant to Executive Order No. 8202 of July 13, 1939, and in force at the time of the issuance of this order, and all permits issued hereunder, shall remain in full force and effect until modified or revoked by the President or by the Secretary of Energy.

**Sec. 5.** Executive Order No. 8202 of July 13, 1939, is hereby revoked.

Notes of Decisions (47)

**Footnotes**

1       So in original. Probably should be "finds".

2       So in original. Probably should be "coordinates and consults".

15 U.S.C.A. § 717b, 15 USCA § 717b
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717*o*

§ 717*o*. Administrative powers of Commission; rules, regulations, and orders

Currentness

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

**CREDIT(S)**

(June 21, 1938, c. 556, § 16, 52 Stat. 830.)

Notes of Decisions (115)

15 U.S.C.A. § 717*o*, 15 USCA § 717*o*
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>     Title 15. Commerce and Trade
>         Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005
Currentness

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation,

if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

## CREDIT(S)

(June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Pub.L. 85-791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub.L. 109-58, Title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

Notes of Decisions (790)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 18. Conservation of Power and Water Resources
        Chapter I. Federal Energy Regulatory Commission, Department of Energy
            Subchapter X. Procedural Rules
                Part 385. Rules of Practice and Procedure (Refs & Annos)
                    Subpart T. Formal Requirements for Filings in Proceedings Before the Commission

18 C.F.R. § 385.2008

§ 385.2008 Extensions of time (Rule 2008).

Currentness

(a) Except as otherwise provided by law, the time by which any person is required or allowed to act under any statute, rule, or order may be extended by the decisional authority for good cause, upon a motion made before the expiration of the period prescribed or previously extended.

(b) If any motion for extension of time is made after the expiration of a specified time period, the decisional authority may permit performance of the act required or allowed, if the movant shows extraordinary circumstances sufficient to justify the failure to act in a timely manner.

SOURCE: Order 225, 47 FR 19022, May 3, 1982; 52 FR 28467, July 30, 1987; 52 FR 35909, Sept. 24, 1987; 53 FR 15032, April 27, 1988; 53 FR 16408, May 9, 1988; 53 FR 32039, Aug. 23, 1988; 55 FR 50682, Dec. 10, 1990; 57 FR 21734, May 22, 1992; 58 FR 7987, Feb. 11, 1993; 58 FR 38528, July 19, 1993; 59 FR 63247, Dec. 8, 1994; Order 639, 65 FR 20371, April 17, 2000; Order 620, 65 FR 81344, Dec. 26, 2000; Order 692, 67 FR 52412, Aug. 12, 2002; Order 685, 71 FR 65051, Nov. 7, 2006; 72 FR 11287, March 13, 2007; Order 756, 77 FR 4895, Feb. 1, 2012; Order 826, 81 FR 43941, July 6, 2016; Order 834, 82 FR 8139, Jan. 24, 2017; Order 854, 84 FR 3983, Feb. 14, 2019; Order 865, 85 FR 2018, Jan. 14, 2020, unless otherwise noted.

AUTHORITY: 5 U.S.C. 551–557; 15 U.S.C. 717–717w, 3301–3432; 16 U.S.C. 791a–825v, 2601–2645; 28 U.S.C. 2461; 31 U.S.C 3701, 9701; 42 U.S.C. 7101–7352, 16441, 16451–16463; 49 U.S.C. 60502; 49 App. U.S.C. 1–85 (1988); 28 U.S.C. 2461 note (1990); 28 U.S.C. 2461 note (2015).

Current through June 29, 2023, 88 FR 42033. Some sections may be more current. See credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## DECLARATION OF REBEKAH HINOJOSA

I, Rebekah Hinojosa, hereby state as follows:

1.      I am of legal age and am competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for use in Sierra Club's challenge to FERC's decision to extend Freeport Train 4's deadline to complete construction.

2.      I am a Senior Campaign Representative of the Sierra Club's Beyond Dirty Fuels Campaign, a position I have held for about three (3) years. In this capacity, I lead our fight to slow and stop the construction of new oil and fracked gas export terminals and related infrastructure in Texas, including in Brazoria County.

3.      The Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Sierra Club has over 700,000 members nationwide, and is dedicated to exploring, enjoying, and protecting the wild places of the earth.

4.      Sierra Club's membership includes persons who live or recreate near the Freeport Train 4 expansion project and throughout the Texas Gulf Coast region. Its membership includes persons subject to the adverse impacts associated with FERC's granting of an extension to the Freeport Train 4 expansion project's deadline to complete construction.

5.      The Sierra Club's Dirty Fuels Campaign is dedicated to averting the worst impacts of the climate crisis through slowing or stopping the expansion of fossil fuel

production and infrastructure and protecting the environment and communities from the environmental impacts of these projects. Part of this program involves opposing the construction and operation of new oil and gas export terminals and associated infrastructure, including pipelines and compressor stations, as well as expansions of such facilities. We have three Campaign Representatives, a Campaign Manager, two organizers, and other staff who work on these issues. We work with Sierra Club members and volunteers to organize rallies, disseminate information, attend public meetings, submit comments to state and federal permitting agencies, and more. The Sierra Club, as part of its Dirty Fuels Campaign, also brings lawsuits concerning oil and gas export terminals where appropriate.

6.    Our Sierra Club team is working hard to protect the environment and the surrounding community from the construction and operation of the Freeport Train 4 expansion project. Sierra Club's concerns with the facility encompass the protection of wildlands, wildlife, habitat, water resources, wetlands, other special aquatic sites, air quality, climate, and the health and safety of its members who will be adversely affected by the construction and operation of the project. Sierra Club strives to empower its members and coalition partners in their efforts to protect their communities, ecosystems, water, and air quality from industrial activities, including those authorized by FERC concerning the Freeport Train 4 expansion project, and promotes the protection of air quality, climate, public health and safety, and other concerns on a national, state and local level towards this end.

7.      Construction and operation of the Freeport Train 4 expansion project will impede my work and the work of Sierra Club's Beyond Dirty Fuels Campaign because it will adversely impact climate, air quality, and other values. Many of Sierra Club's members live and recreate near the proposed Stage 4 expansion and other parts of the Texas Gulf Coast region. And environmental harms caused by FERC's extension detract from Sierra Club's efforts to protect these communities, our members, and the public. As noted, Sierra Club seeks to protect and preserve the environment. My understanding is that construction and operation of the Freeport Stage 4 expansion project will result in the emission of large amounts of air pollution among other impacts to the environment. These air pollution emissions are directly contrary to Sierra Club's mission to protect the environment in the Texas Gulf Coast region and in the Freeport area.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.


Dated June 23, 2023

*Rebekah Hinojosa*
Rebekah Hinojosa

012

## DECLARATION OF MELANIE OLDHAM

I, Melanie Oldham, hereby state as follows:

1. I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for Sierra Club's challenge to FERC's decision to extend the Freeport Train 4 project's construction deadline.

2. I am 64 years old and live in my home which is between the Freeport pretreatment facility and the LNG facility on Quintana Island. My address is 1206 Broad Street, Freeport, TX 77541. I have lived in this area for about 10 years and have no plans to leave. I am approximately 2.75 miles from the pretreatment plant and approximately 3.14 miles from the LNG facility. I already experience negative impacts from the current Freeport LNG facility and I am deeply concerned that the Train 4 project is going to make me experience additional negative impacts and make the impacts I already experience worse.

3. I have been a member of the Sierra Club since 2014. I became a member because I love the outdoors and I wanted to associate myself with an organization that believes in protecting the environment and public health. I also became a member because I am concerned with the air pollution and water quality in my area and wanted more information on how to support the work that is being done. I previously provided a standing declaration for Sierra Club's challenge to the initial Freeport LNG project.

4. The Sierra Club is a nationwide non-profit environmental membership organization, which has its purpose to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to

educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

5. I am a part time physical therapist and a public health and environmental advocate. I am the founder of For Clean Air & Clean Water in Brazoria County, which was founded in 2008. We educate our community about various proposed projects and expansions. And we provide public education about environmental issues, such as when the EPA deemed my county, Brazoria County, in nonattainment under the Clean Air Act. We hold meetings twice a month. We also pass out flyers and put up signs about various projects we oppose and why. As an in-home physical therapist, I have seen many patients with COPD and/or asthma. I am concerned about the impacts that air pollution and other environmental impacts will have on my patients' health.

6. I am concerned about how air pollution from construction and operation of the Train 4 expansion project, including both the expansion of the export terminal and the pretreatment facility, will affect my enjoyment and use of my property, enjoyment and use of my community, and my health and wellbeing. The air pollution from construction and operation the Train 4 project, including particulate matter, volatile organic compounds, nitrogen dioxide, sulfur dioxide, benzene, methane, and other pollutants, scares me. It is my understanding that these pollutants cause breathing and other health problems. And because I live, work, and recreate so close to the facility, I know I will inhale air pollution from the Train 4 project. I am concerned about how inhaling this air pollution will impact my health and wellbeing. I am also concerned about the cumulative effect that the Train 4 project will have on my health and wellbeing when its emissions are combined with the emissions from other industrial facilities in the project area. These

other facilities include, but are not limited to, the initial Freeport LNG facility, the Dow Chemical facility, the BASF facility, the SI Company facility, and the ME Global facility. Because of all these industrial facilities, living here can be like living in a chemical soup. Brazoria County is a non-attainment county for ozone under the Clean Air Act. And all of these facilities emit massive amount of air pollution in my community. I am concerned about how the air pollution from Train 4 will further reduce the air quality and how the pollution from Train 4 will interact with the air pollution from these other facilities. I am concerned about the impact this will have on my health.

7. I visit Quintana Beach, on Quintana Island, approximately once a month. I plan to continue going approximately once a month in the future. Quintana Beach is adjacent to the Freeport LNG export terminal and is even closer to the export terminal than my home. Where I go on Quintana Beach is approximately 0.25 miles from the Freeport LNG export terminal site. I can see the entire Freeport LNG export terminal when I am on Quintana Beach, including where the Train 4 expansion would be. Just being able to see the export terminal undermines my enjoyment of going to Quintana Beach and its beautiful coastline. I would certainly be able to see construction of the Train 4 project and would be able to see Train 4 after it was constructed. Being able to see the Train 4 project and construction of the Train 4 project would further undermine my enjoyment of the aesthetics of this area because it would be even more industry intruding on my time at the beach. Additionally, when I visit Quintana Beach there are so many foul odors from the Freeport LNG facility that it makes it difficult to enjoy my time there; my eyes continually water. And I know I am breathing in air pollution from the Freeport LNG export facility. It is just so close. I am concerned that the Train 4 project would make this

problem even worse because it would increase air pollution emissions on Quintana Beach. If the Train 4 project is constructed, I would consider visiting Quintana Beach less often because of the increased air pollution. This would make me upset because Quintana Beach is one of my favorite places to recreate. But I would have to seriously consider going less, because I am concerned about the impact that inhaling the increased air pollution from construction and operation of the Train 4 expansion project would have on my health. In addition to my concerns about the Train 4 project's aesthetic impacts and air pollution, I am concerned about noise and traffic impacts from construction of the Train 4 project on my enjoyment of Quintana Beach. I still remember when the initial Freeport LNG export facility was constructed. The traffic to and from Quintana Beach was terrible. I am concerned that construction of the Train 4 project will make traffic going to and from Quintana Beach really bad too. I hate sitting in traffic and if there was more traffic going to and from Quintana Beach, my enjoyment of going to Quintana Beach would be substantially diminished. And I am also concerned about how noise from construction of the Train 4 project will impact my enjoyment of Quintana Beach. When the initial Freeport LNG facility was constructed, I could clearly hear noise from construction when I was at Quintana Beach. It made my experience at Quintana Beach much worse because the noise was very loud and unpleasant and I go to Quintana Beach to peacefully enjoy the beach. I am concerned that construction of the Train 4 project will be similarly loud and unpleasant. This would significantly reduce my enjoyment of going to Quintana Beach because, again, I go to Quintana Beach for quiet enjoyment of the beach and to enjoy the peace of being outdoors. Construction noise is completely incompatible with this.

8. I also enjoy visiting a beautiful bird sanctuary called Quintana Neotropical Bird Sanctuary about 0.25 miles away from the Freeport LNG export terminal site and the proposed Train 4 project. I go about once a month. I plan to continue going about once a month in the future. It is one of my favorite places to recreate. I love to visit the sanctuary and use the sanctuary's birding trail to photograph birds. I especially enjoy going there because Brazoria County has a large diversity of birds. But if Train 4 were built, I would likely go to the sanctuary less because I am concerned that the Train 4 expansion may not be safe and would cause dangerous incidents like explosions or fires. I am also concerned that the Train 4 expansion would have other impacts as well that would cause me to be less likely to go and would injure me when I do go. These include air pollution, foul odors, noise, and visual impacts from construction and operation of the Train 4 project. As already explained, I am very concerned about the air pollution from construction and operation of the Train 4 project. Because the bird sanctuary is so close to the Train 4 project, I am concerned about the impact to my health of breathing in the Train 4 air pollution at the bird sanctuary. I can already smell odors that clearly come from an industrial facility almost every time I visit the bird sanctuary. It is my understanding that the Freeport LNG export terminal contributes to these industrial odors. It is just so close to the facility. I am concerned that if the Train 4 project goes forward, it will make the frequency of the odors go up and will make them more intense. And, finally, one of my favorite parts of the bird sanctuary is a tower you can climb up and have a view of Freeport, Quintana Island, and the shore. From the tower, I can see the entire Freeport LNG export terminal footprint. I will be able to see construction of the Train 4 expansion and the Train 4 expansion itself, if it is placed into service. I already really dislike being

able to see the Freeport LNG export terminal and it reduces my enjoyment of going to the bird sanctuary. But seeing the Train 4 expansion from the tower would make it even worse. It would make me sick seeing Train 4 being constructed and going into operation while I am trying to enjoy the natural beauty of my home. It would substantially reduce my enjoyment of going to the bird sanctuary.

9. Another one of my favorite recreational activities is to go to Bryan Beach. I do this about once a month and I plan to go at the same rate in the future. However, if the Train 4 expansion project is constructed, I may go less often. Bryan Beach is on Quintana Island and is about 0.25 miles away from the Freeport LNG export terminal. Where I go on Bryan Beach is immediately adjacent to the proposed Train 4 expansion project. When I am there, I smell odors from the Freeport LNG facility and I experience symptoms like coughing from the air pollution emissions of the Freeport LNG facility. This makes it really difficult to enjoy the time I spend on Bryan Beach. It is my understanding that the Train 4 expansion project would involve even more air pollution in the area from construction and operation of the project. I am concerned that the Train 4 project's air pollution would make my experience at Bryan Beach even worse and would further reduce my enjoyment of Bryan Beach. I am concerned that I would smell odors more frequently and would experience symptoms more frequently and more acutely. Additionally, I am concerned about the health impacts of breathing in the air pollution from Train 4 when I visit Bryan Beach. Finally, I am concerned about how construction noise from the Train 4 expansion project will impact my enjoyment of going to Bryan Beach. As I explained, construction of the Train 4 project would be immediately adjacent to where I go on Bryan Beach. I am sure that I will be able to hear construction noise

when I am there and Train 4 is being constructed. Construction noise would significantly reduce my enjoyment of Bryan Beach because when I am there, I am there to quietly enjoy the beach and being outdoors. Construction noise is completely incompatible with that purpose.

10. My daughter and I used to fish all the time on the jetties that extend from the Freeport LNG terminal to the Gulf of Mexico. But we fish less now. We went about once in the past five months and plan to fish more in the future at about the same rate. We enjoy fishing to relax and destress. I am concerned about the Train 4 project's impact on my enjoyment fishing here. LNG tankers already sometimes disrupt my ability to fish on the jetties. When LNG tankers are present, the Coast Guard clears the jetties. This happens frequently. And, of course, once the Coast Guard clears the jetties, we cannot fish on the jetties and have to leave. I am concerned that the Train 4 expansion will increase ship traffic and will increase the frequency where the Coast Guard clears the jetties even more. Additionally, because the jetties are so close to the Freeport LNG export terminal, air pollution and odors from the terminal are a persistent problem. I am concerned that the Train 4 expansion would increase air pollution and odors at the jetties and I am concerned that construction of the Train 4 expansion will cause noise audible from the jetties. For these reasons, if the Train 4 expansion moved forward, I would be less likely to fish at the jetties and I am concerned that, when I go, my enjoyment will be significantly reduced. I would also be concerned about the impacts to my health of breathing in air pollution from construction and operation of the Train 4 expansion at the jetties.

11. I recently got a dog and I take my dog for a walk in my neighborhood at least once a day. I plan to continue walking my dog at least once a day in the future. I look forward to this dog walk every day, it is one of my favorite recreational activities. But walking outside with the air pollution already present in my neighborhood is challenging for me. When I go for my daily dog walk now, I experience watery eyes, shortness of breath, and coughing. I get so worried and anxious about the air pollution I am breathing in. I am very concerned that the increased air pollution emissions from constructing and operating the Train 4 project will make the air quality I experience during these walks even worse. I am concerned that the Train 4 project emissions will make the symptoms I mention above more frequent and more intense. As a result, if the Train 4 project goes forward, it would substantially reduce the enjoyment I derive from these walks. I am also concerned about the impact to my health of walking outside and inhaling the air pollution from construction and operation of the Train 4 project.

12. As a home health physical therapist, I visit and treat my patients in their homes. I schedule approximately six to seven patients per work day and I work two to three days per week. I plan to keep up this schedule in the future. About two times per week I drive past the Freeport LNG export terminal and pretreatment plant to visit patients. The route that I take past the pre-treatment plant is on Highway 332, it crosses about 0.50 miles from the pre-treatment plant. I take this route about twice per week and, when I do, I can clearly see the pre-treatment plant from the road. When I drive by the Freeport LNG terminal, approximately twice per week, I can also clearly see the Freeport LNG terminal. About once a month, I take a levy road as a shortcut. That road is right by the driveway which turns into the Freeport LNG terminal. I plan to continue to take this route about

once per month. It is my understanding that construction of the Freeport Train 4 expansion will involve an increase in construction traffic at the Freeport LNG export terminal site and pre-treatment facility site. Thus, I am concerned that construction of the Train 4 expansion would have serious impacts on my commute when I drive past these locations. I am concerned that construction traffic for the Train 4 project would substantially slow down my commute. As a result, I am concerned that I would have to reduce the amount of patients I see. I pack my work day full of patients and a lengthier commute would mean that I would have to see less patients per work day. This would negatively affect my income and would be upsetting because I enjoy and am fulfilled by treating my patients. The loss of income would be especially problematic because I am the sole wage earner for my family.

13. In recent memory, the Freeport LNG pre-treatment facility has unplanned events where it releases significantly more-than-usual amounts of air pollution through its flares approximately once a month. Since the explosion at the Freeport LNG facility, these events have occurred more frequently. I know these events occur, because Freeport LNG posts a sign outside the facilities and I can see continued emissions from the flares. I am concerned that if the Train 4 project is put into operation, that these events will happen more frequently and, when they do happen, the increased pollution from Train 4 will make them worse. I am concerned about the impacts that would have on my health.

14. It is my understanding that the Train 4 project involves the construction of a new 42-inch pipeline. It is my understanding that the pipeline would be constructed through the Freeport area's beautiful wetlands, go through Surfside Beach and terminate at the LNG export terminal on Quintana Island. As explained above, I often go to and recreate in

these areas. It is also my understanding that the pipeline route would go within approximately 0.50 miles of one of my favorite restaurants, the Jetty Shack. The Jetty Shack is located at 412 Parkview Rd., Surfside Beach, TX 77541. A map showing the location of the Jetty Shack is reproduced below. I eat there about once a month, it is the best hamburger in the area. I plan to continue eating there about once a month. I also go crabbing and fishing in the immediate vicinity of the Jetty Shack about once every two months. I plan to continue crabbing and fishing in this area about once every two months. I am especially fond of the aesthetics of this area. I love the beaches, the ambience, the great views, and the birds. I am concerned that construction of the Freeport pipeline through this area will ruin my aesthetic enjoyment of the area. It is my understanding that construction and installation of the pipeline will be extremely noisy, have visual impacts, and emit air pollution. As a result, construction and installation of the Freeport pipeline would significantly reduce my enjoyment of eating at my favorite restaurant and fishing and crabbing in this area. I am also concerned that if the pipeline were placed into service, there will be an increased risk of pipeline leaks and explosions. It would be impossible to go to the Jetty Shack or to crab and fish in this area without being worried about a pipeline leak or explosion. The anxiety I would feel from this would substantially reduce my enjoyment of going to the Jetty Shack or crabbing and fishing in this area.



15. I am concerned that Freeport LNG does not have an adequate emergency response plan. There is only one bridge on and off Quintana Island, where the Train 4 project will be constructed, and there are thousands of people that visit Quintana Island annually, especially during the holidays. When the explosion at the existing Freeport LNG facility happened, no one seemed to know what to do. I feel fortunate that no one was hurt as a result of this explosion. I am concerned that it is not possible to safely evacuate the area in the event of another incident. This would impact my family and me if an incident occurred while we were on the island, and also poses a risk to Freeport LNG employees, residents, and other visitors.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 27, 2023

_Melanie Oldham_
Melanie Oldham

Filed: 06/30/2023

Document #2006000

USCA Case #23-1059

## <u>DECLARATION OF PAM HARRIS</u>

I, Pam Harris, hereby state as follows:

1. I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated. I give this declaration for Sierra Club's challenge to FERC's decision to extend the Freeport Train 4 project's deadline to be placed into service.

2. I am 66 years old and live with my fiancé in my home which is approximately 3.74 miles from the pre-treatment facility and 4.57 miles from the LNG facility on Quintana Island. It is my understanding that the Freeport Train 4 expansion will be constructed at both of these locations. My address is 111 Velasco Shores, Surfside Beach, Texas 77541. I am at my home in Surfside Beach about two-thirds of the year.

3. I am a member of the Sierra Club and joined in January 2023. I joined the Sierra Club because I want to be a part of organizations that work to preserve the environment. It's very important to me. This year, I am going to be involved in the turtle patrol. Since the turtles are endangered my job is to spot the turtles and their eggs and report them to Texas A&M so they can be monitored and taken care of.

4. I am also a member of Clean Air & Clean Water in Brazoria County since June 2022. Before I joined, I wasn't aware of the risk LNG export infrastructure posed to my community and I did not have exposure to the fight against LNG export facilities. But Clean Air & Clean Water in Brazoria

County gave me the knowledge I needed. And I now try to educate my community in Surfside.

5. I am becoming increasingly concerned with the industrial development near my home. A pipeline for the SPOT project, an offshore oil export facility, will pass within a mile of my home. And as noted above, the Freeport Train 4 expansion, including the associated pipeline, will be constructed very close to my home as well. If these projects go forward, I will seriously consider trying to move. I am not sure where I would go, and I do not have definite or specific plans to move, but I do not want to live so close to an expanded LNG export facility and other industrial infrastructure. However, I am deeply concerned about the Train 4 Project's impact on the value of my property and am concerned about whether I would be able to sell my home should I decide to do so. I'm worried that even if I eventually wanted to sell my home, I would be stuck because my home would lose so much value. One aspect of the Train 4 Project that I think will substantially reduce the value of my home is the increase in LNG carrier traffic that comes by my home. My home is in the second row of homes from the shore. LNG ships pass my home approximately 4-10 times per day to go to the LNG export terminal as currently constructed. When they pass by, it is my understanding that some nearby homes shake, and because the tankers are so large, they completely dominate my view of the shore, ruining my enjoyment of looking out at the Gulf when they are present, and undermining the entire point of owning property on the shore. It

is also my understanding that the LNG tankers emit air pollution, including particulate matter. Because of this air pollution, I am concerned about the LNG tankers' impact on my health. The constant LNG tanker traffic is an incredibly unpleasant experience and it decreases the enjoyment I derive from my property. If Train 4 goes forward and ship traffic increases, it would make the situation worse and would further decrease the enjoyment I derive from my property. An increase in LNG tanker traffic would substantially reduce my enjoyment of viewing the shore from my property. Moreover, I am concerned that more LNG tanker traffic will lead to more air pollution, including particulate matter. I am concerned about the impact the increased air pollution will have on my health. Finally, I am also worried that the increase in LNG tanker traffic, and its associated impacts, would reduce the value of my property and make it harder to sell in case I want to sell my property in the future.

6. Where I live on Surfside Beach has such bad air quality most days because of the amount of industry polluting the air. The pollution where I live is so bad that it is visible several times a month. I am very concerned that the Train 4 Project will make the air quality even worse. One aspect of the current Freeport LNG facility that I am especially concerned about is the flaring from the LNG export terminal. I can see flares from several facilities from my house and at least one of them is operating nearly every day. One of these flares is at the Freeport LNG export facility. When the flaring occurs, I can

027

smell foul odors and I can tell that I am not breathing in good quality air. I am concerned that the Train 4 project will make flaring occur more often and will increase the amount of pollution that is emitted during flaring. I am concerned about the impact this will have on my health and wellbeing. I am also concerned about air pollution from other aspects of the Freeport LNG export terminal and pretreatment facility. I am concerned about all of the air pollution emitted by the Freeport LNG facilities, but I am especially concerned about emissions of particulate matter and volatile organic compounds. It is my understanding that emissions of these kinds of pollutants can have very negative impacts on my health. I am concerned that if the Train 4 expansion project goes forward, the Train 4 facilities will emit even more air pollution, including particulate matter and volatile organic compounds. I am concerned about the impact that air pollution from the Train 4 project will have on my health.

7. I am very focused on taking care of my health, especially as I get older. However, it is difficult with how close the Freeport LNG terminal is to my house. I am constantly concerned about my health and undergo a lot of medical testing to ensure my health. Recently I did some testing on my heart. The testing determined that my heart is in A-Fib, which means that I have an irregular heartbeat. In the last several months I have struggled with labored breathing, especially on days in Surfside where the air quality is noticeably poor. And recently, I had bronchitis. It is my understanding that

my bronchitis is the result of the air pollution I constantly inhale in Surfside Beach irritating my lungs and airways. I am very concerned that the Train 4 project will worsen the air quality that I experience and will harm my health. I am concerned that I will get bronchitis more often and that the other respiratory problems I experience, like labored breathing, will get worse if the Train 4 project goes forward

8. One of my favorite recreational activities is to go to the beach in Surfside Beach, which is right near my home and approximately the same distance from the Freeport LNG facilities as my home is. I go to the beach approximately once a day and plan to continue going approximately once a day. I used to go to Quintana Beach and Bryan Beach in Freeport several times per week because they were the best places to collect beautiful sea shells. But I haven't been to those beaches in two years and don't plan to return because industry has ruined them. Now, I only go to the beach in Surfside. I go to enjoy being outside by the water. But I am worried that the beach in Surfside will be ruined too. The Freeport LNG facilities have already made going to this beach less enjoyable for several reasons, including LNG tanker traffic and decreased air quality. I am very concerned that the Train 4 project will make going to this beach even less enjoyable because it will make air quality at the beach worse and will increase LNG tanker traffic even more. If these impacts occurred, they would significantly reduce my enjoyment of going to the beach.

9.  I also love to birdwatch, go for walks, and go on golf cart rides with my fiancé. One of the main reasons we live in Surfside Beach is to lead an active lifestyle and to do these activities outdoors. Because of the poor air quality, I watch the birds from my windows at home. I still go on walks at least three to four times a week around my home, and plan to continue to go on such walks, but I am very concerned about the air pollution I know I am breathing in when I go for walks. This makes it difficult to enjoy the walks because all I can think about is the air pollution. I worry about the impacts to my health from inhaling the air pollution and have significant anxiety about the potential impacts to my health. I am concerned that the Train 4 project will make the air quality I inhale on my walks even worse. I am concerned about the impact that this reduced air quality will have on my health. And I am concerned that the increased air pollution will substantially reduce the enjoyment that I get out of going for these walks.

10. There are so many industrial facilities near my home. At night I am bothered when I look out the window and see so much light, including light from the Freeport LNG export terminal. I know it's not city lights but, instead, light from the nearby industrial facilities. It is disturbing to look off my porch and see all this light. Seeing all this industrial light reduces my enjoyment of my property in Surfside because one of the main reasons I wanted to own a house on the beach was to enjoy the serenity of the coast. Industrial lighting severely undermines my enjoyment of being on the coast. Because I can

already see the lighting from the existing Freeport LNG export terminal from my home, I am concerned that the Train 4 expansion will make the situation even worse because it would involve even more industrial lighting that I would be able to see from my home. If the Train 4 expansion were built, the additional lighting from construction and operation of the facility would further reduce my enjoyment of my property.

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 26, 2023

Pam Harris

## DECLARATION OF GWENDOLYN JONES

I, Gwendolyn Jones, hereby state as follows:

1. I am of legal age and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise specified. I am providing this declaration for Sierra Club's challenge to FERC's decision to extend Freeport Train 4's deadline to complete construction.

2. I became a member of the Sierra Club on February 1, 2023. I joined to fight against the development of LNG infrastructure in my community. I am concerned about the health of myself, my community, and my family. It is my understanding that LNG facilities have a lot of adverse environmental impacts like air pollution that reduces air quality in the area around the facility. I do not want to experience these impacts and I do not want my neighbors and my community to experience these impacts. Joining the Sierra Club helps me have a stronger voice to be heard.

3. I have also been a member of Clean Air & Clean Water in Brazoria County since around 2021. I attend strategy meetings, rallies, and other events to fight for my community. I think it is important that we support one another all along the Texas gulf coast as industry keeps developing without consideration to our health and wellbeing. Being a part of this organization has educated me about several harms associated with LNG facilities like increased risk of cancer and other illnesses, adverse impacts to water quality, and adverse impacts to air quality.

4. I also have a lot of experience with industry. I have lived around industry my entire life, I have worked at industrial facilities, and I have had and currently have family who work in industrial facilities. I worked in industrial facilities from 1975 to 2010, the vast

majority of my career. I personally worked in several different capacities, including in a laboratory at an industrial facility. Thus, I have long been aware that industrial facilities handle potentially harmful substances. One such substance that I am especially concerned about is benzene. Although I am concerned about many chemicals and substances handled at industrial facilities. It is my understanding that exposure to benzene can lead to a higher risk of cancer. Around 2016, I became aware of the existence and risks of LNG export facilities. It is my understanding that LNG facilities emit many substances that have health risks, including benzene and other pollutants. I have extensive personal experience with the current Freeport LNG facility. I have personally witnessed the impact that this facility has had on the surrounding community. It has made the air quality surrounding the facility significantly worse since it came online. And because of my experience in industrial facilities, I know all too well what the Freeport LNG facility has been emitting and how harmful those substances can be on the health of members of the community. It is my understanding that the Freeport Train 4 expansion project would lead to emissions of air pollution from construction and operation. As a result, I am very concerned that the pollution from construction and operation of the Train 4 expansion project will cause even more harm and make air quality even worse.

5. I lived in Freeport, TX until 2008, when I moved to Angleton, TX, which is a town near Freeport. However, I still own property in Freeport and I live nearby specifically so I can be a part of my community in Freeport. My family has been in Freeport since the 1920s and I hope to move back to Freeport in the future. My property is located at 214 West 9th Street, Freeport, TX 77541. I plan to build a home on this property in the future and live here. My property is approximately 2.74 miles from the Freeport LNG pretreatment

facility and 2.18 miles from the Freeport LNG terminal. Because I have family, friends, and property in Freeport, I visit Freeport approximately every other day. This is challenging for me because every time I am in Freeport, I am concerned for my health and safety, especially after the recent explosion at the Freeport LNG facility. But I continue to go and plan to continue to go in the future at the same rate to see my friends and family. I also attend True Honor Baptist Church located at 715 Robertson Street in Clute, Texas every Sunday. It is approximately six miles from the Freeport LNG pretreatment plant and approximately eight miles from the LNG export terminal.

6. I have always really enjoyed being outdoors and I specifically enjoy being outdoors in Freeport when I am there. Some of my favorite activities are walking, crabbing, shrimping, fishing, and just generally being outside by myself and with my loved ones. I especially enjoy doing these activities at Bryan Beach and Quintana Beach in Freeport. These beaches are on either side of the Freeport LNG export terminal on Quintana Island. I would prefer not to go to these beaches anymore because of the LNG terminal. But my friends and family have many events there so I am there about once a month. I will continue going to these beaches approximately once a month in the future. Visiting these places is already less enjoyable than it used to be since the Freeport LNG terminal began operating. The sound of the water at these beaches used to be so peaceful and enjoyable. But both beaches are so close to the LNG terminal that the air quality at both beaches is always awful. I am concerned that construction and operation of the Train 4 project would make the air quality at both beaches even worse. I am concerned that the Train 4 Project would increase air pollution and worsen the air quality at both beaches. I am also concerned that noise from construction and operation of Train 4 would substantially

interfere with my enjoyment of both beaches. And, finally, I am concerned about the impact that breathing in air pollution from construction and operation of the Train 4 project when I am at these beaches will have on my health.

7. Another of my favorite places to visit in Freeport is Surfside Beach. Where I go on Surfside Beach is within three miles of both the Freeport LNG export terminal site and pretreatment facility. I go to Surfside Beach approximately every weekend during the summer and once a month during the winter. I plan to continue going at these rates in the future. In addition to just enjoying the beach and going outside, when I go to Surfside Beach, I love to go to restaurants and eat outside. I am concerned that air pollution from construction and operation of the Train 4 project will impact my ability to enjoy these activities. I am worried that the air pollution will cause unpleasant odors and make me experience symptoms like coughing, shortness or breath, and watery eyes. As explained below, I experience several respiratory symptoms when I inhale air pollution. Thus, additional air pollution would substantially reduce my enjoyment of going to Surfside Beach. I would find this incredibly upsetting as Surfside Beach is one of the only places I feel I can go in the Freeport area to be outside and recreate. I am also concerned about the impact to my health from breathing in air pollution from construction and operation of the Train 4 project when I am at Surfside Beach.

8. I suffer from numerous medical conditions including asthma and COPD. As a result, I consistently suffer from labored breathing and other respiratory symptoms. Because of my pre-existing health issues, I am very sensitive to environmental contaminants like air pollution and water pollution. As a result, every time I visit Freeport, I spend more time than I would like to inside and keep a mask on at all times because breathing in Freeport

is difficult for me. I am fearful of breathing the air in Freeport because it is my understanding that it is a cancer cluster area. Additionally, many of my friends have many health problems that I worry about. The air quality in Freeport as it exists today makes it so I truly cannot enjoy being outside anymore without the fear of getting cancer or having an asthma attack due to the air pollution. Sometimes, especially when the air quality is really bad in Freeport, I have respiratory problems where I lose my voice and it sounds hoarse. When this happens, I get scared. Additionally, when the air quality in Freeport is worse, I get more asthma attacks and need to use my inhaler more often. I find asthma attacks terrifying. I am deeply worried that construction and operation of the Train 4 Project will cause all my health problems to worsen when I am in Freeport because of the increased air pollution and other environmental impacts associated with the project. I am especially worried that the increased air pollution from construction and operation the Train 4 project will reduce the air quality in Freeport and make me experience respiratory symptoms, including asthma attacks, more often. I am also concerned about the impact breathing more air pollution from construction and operation of the Train 4 project will have on my health and wellbeing.

9. I am also very concerned about the safety of the Train 4 Project. I was in the area when the explosion at the Freeport LNG export terminal happened. People were being evacuated off the island as methane was filling the air. It was a very dangerous situation. I am concerned that if the Freeport Train 4 project goes forward another explosion will happen.

036

I declare under the penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on June 2̲8̲, 2023

Gwendolyn Jones

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June, 2023, I have served the foregoing Opening Brief for Petitioner Sierra Club, including the Addendum thereto, on all registered counsel through the Court's electronic filing system (ECF).

*/s/ Thomas Gosselin*
Thomas Gosselin
Sierra Club
P.O. Box 4998
Austin, TX 78765
424-346-3276
tom.gosselin@sierraclub.org

*Attorney for Sierra Club*